## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

LEONARDO de SOUZA, on behalf of himself
and all others similarly situated,

Civil Action No.

**CLASS ACTION COMPLAINT**

Plaintiff,

vs.

MAGNUM D'OR RESOURCES, INC.,
JOSEPH J. GLUSIC, and MICHEL BOUX,

Defendants.

JURY TRIAL DEMANDED

Plaintiff, Leonardo de Souza, on behalf of himself and a Class (defined below) comprised of all other persons similarly situated, alleges upon the investigation made by and through his counsel, which includes, *inter alia*, a review of relevant public filings made by Magnum D'Or Resources, Inc. ("Magnum" or the "Company") with the Securities and Exchange Commission ("SEC"), as well as teleconferences, press releases, news articles, analysts' reports, and media reports concerning the Company. This Complaint is based upon plaintiff's personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

## SUMMARY OF ACTION

1.      Magnum purports to operate in the tire recycling industry. Specifically, in addition to claiming to have the largest tire landfill in the United States, the Company purports to be engaged in attempts to produce custom compounds, retread compounds, processing aids, advanced state-of-the-art equipment, and reactivated ambient/cryogenic rubber powders for the global market.

2.      During the Class Period (defined below) the Company made numerous false

statements to the investing public in order to engage in a fraudulent scheme.  Specifically the Company would make false statements regarding Magnum's prospects.  The false and misleading statements had the effect of driving up the Company's stock price.  The elevated stock price was then used by the defendants to carry out an illegal kickback scheme.

3.      When the Company's auditors finally revealed that something questionable may have been occurring, Magnum's stock price declined precipitously.  Currently Magnum trades on the Pink Sheets for less than 1 cent per share.  During the Class Period, the Individual Defendants (defined below) walked away with millions of dollars in compensation.

4.      This is a class action on behalf of all persons, other than defendants, who purchased Magnum securities between July 2, 2008, and April 13, 2010, inclusive (the "Class Period"), to recover damages caused by defendants' violations of the federal securities law (the "Class").

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because many of the acts and practices complained of herein occurred in substantial part in this judicial district.

7.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### The Plaintiff

8.      Plaintiff purchased the Company's securities as set forth more fully in the annexed certificate, and suffered economic damages.

### The Company

9.      Magnum is a Nevada corporation. Throughout the Class Period, Magnum's principal place of business was located at 1326 S.E. 17th Street, Suite 513, Fort Lauderdale, Florida 33316.  Currently, the Company lists its headquarters as 12311 Weld County Road 41, Hudson, Colorado 80642.

### The Individual Defendants

10.     Defendant Joseph J. Glusic ("Glusic") served the Company as a director from January 2007 until his resignation on March 18, 2011.  Effective January 1, 2008, until his resignation Mr. Glusic also served as President, Chief Executive Officer, Principal Executive Officer, Chief Financial Officer, Principal Financial Officer, Secretary and Treasurer.  On April 29, 2011, the Securities and Exchange Commission commenced an action alleging fraud against Mr. Glusic and others.  From October 1, 2008, through September 30, 2009, Mr. Glusic received a salary of $793,000 and a Bonus of $2,800,000 for a total compensation of approximately $3.6 million.  In the three years combined that he was director, President, Chief Executive Officer, etc. of Magnum, the Company generated revenues of only $85,070.

11.     Defendant Michel Boux ("Boux") served as a director of the Company from October 7, 2008, through December 29, 2009.  Prior to serving on the Company's board, on March 1, 2008, Mr. Boux had been retained by Magnum and Director of Operations for the Company.  Subsequently, in conjunction with his board appointment, Mr. Boux was named Vice President of Canadian Operations.  As of August 30, 2009, Mr. Boux owned 1,042,500 shares of

Company stock.  Much of the fraud alleged herein occurred during Mr. Boux's tenure at the Company.

12.     Defendants GLUSIC and BOUX are sometimes referred to herein as the "Individual Defendants."  Because of the Individual Defendants' positions as directors or senior officers of the Company, each had access to the material adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of them, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Each was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act, was traded on the over-the-counter Bulletin Board ("OTCBB"), and is governed by the provisions of the federal securities laws, each defendant had a duty to disseminate timely, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that became materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants participated in the drafting, preparation, or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about the Company's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about the Company and its business, issued or adopted by the Company, materially false and misleading.

16.     The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class

Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

17.     Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases alleged herein, and is therefore primarily liable for the representations contained therein.

18.     Each of the defendants is also liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Magnum securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme (a) deceived the investing public regarding the Company's business, operations, and the intrinsic value of the Company's publicly traded securities, and (b) caused plaintiffs and other members of the Class to purchase Magnum's publicly traded securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those persons who purchased Magnum securities during the Class Period and who suffered damages thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's most last filed quarterly financial statement filed with the SEC on Form 10-Q, on February 16, 2010, as of that date Magnum had 73,436,212 shares of common stock outstanding.  While the exact number of Class members is unknown to

plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial condition of the Company;

(c)     whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)     whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Background**

25.     On December 28, 2007, Magnum filed a Form S-8 registration statement with the SEC.  The Form S-8 announced and provided the details of the Company's recently adopted 2007 Consultant Stock Option, SAR and Stock Bonus Plan (the "2007 Plan").  The 2007 Plan authorized the Company to grant non-qualified stock options with or without stock appreciation rights ("SARs"), SARs and stock bonuses to consultants of the Company.  Moreover, pursuant to the S-8, the Company made available 11,000,000 shares of Magnum stock for grant to consultants under the 2007 Plan.  Consistent with Federal Securities Laws the 2007 Plan noted that "no person shall be a Participant in this Plan in consideration for consulting or other services related to capital raising activities for the Company or related to any stock promotion activities for the Company."

26.     SEC Form S-8 is used to register company stock that will be offered and sold to employees or consultants under certain circumstances. To lawfully receive S-8 stock from a company, employees or consultants cannot perform work in connection with a capital-raising transaction or which indirectly promotes or maintains a market for the stock.  Specifically the

SEC indicates that Form S-8 is available for the issuance of securities to consultants or advisors only if:

> (i)     they are natural persons;
> (ii)    they provide bona fide services to the registrant; and
> (iii)   the services are not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities.

27.     Form S-8 cannot be used to register offers and sales of securities to consultants where, by prearrangement or otherwise, the issuer or a promoter controls or directs the resale of the securities in the public market, or the issuer or its affiliates directly or indirectly receive part of the proceeds from such resales.

28.     Issuing S-8 stock under in violation of the aforementioned rules nullifies the registration and makes it unlawful to sell or deliver unregistered securities through interstate commerce.

29.     On June 29, 2009, Magnum filed another Form S-8 registration statement with the SEC, signed by defendant Glusic.  The Form S-8 referenced the 2009 Consultant Stock Option, SAR and Stock Bonus Plan (the "2009 Plan") and, similar to the 2007 Plan, indicated that "no person shall be a Participant in this Plan in consideration for consulting or other services related to capital raising activities for the Company or related to any stock promotion activities for the Company."  The S-8 registration set aside 10,000,000 shares of Magnum stock to be distributed to consultants pursuant to the 2009 Plan.

**The Illegal Transfer of Shares**

30.     According to a complaint filed by the SEC against *inter alia* Magnum and defendant Glusic, in the Southern District of Florida on April 29, 2011, starting in 2008, Magnum illegally issued shares of S-8 stock pursuant to the aforementioned Form S-8

registration statements.  Specifically, Magnum issued Company stock, pursuant to the 2007 and 2009 Plans, to three individuals purported to be consultants of the Company when in fact they were not.

31.     Glusic wrongfully advised Magnum's transfer agent that Magnum properly issued the shares pursuant to the Form S-8 registration statements. Nevertheless, these purported consultants rendered few, if any, permissible services, and were not eligible to receive S-8 stock. Indeed the SEC alleges that their only service to the Company "was to funnel profits they had received from selling Magnum S-8 stock back to the company."

32.     According to the SEC, the brokerage account records show that after receiving the Magnum S-8 stock, these three individuals: 1) deposited most of their shares at Gibraltar Global Securities ("Gibraltar"), a Bahamian broker-dealer; 2) sold their S-8 shares within a few days of depositing them; and 3) wired the S-8 stock sale proceeds directly from their Gibraltar brokerage accounts to Magnum's bank accounts, or indirectly through their personal bank accounts.

33.     To disguise these fraudulent transactions, Magnum entered into sham promissory notes with the three individuals.  The promissory were a way to divert money back to the Company.  Moreover the notes were a sham because all of the funds were derived from the S-8 stock sales.

34.     The Form S-8 registration statements were materially false and misleading because they stated Magnum would issue the S-8 stock for permissible consulting services and it did not. Moreover, as alleged in the SEC complaint, Magnum and Glusic knew they were participating in a fraudulent kickback scheme, because they tried to conceal the transactions and knew the S-8 stock had not been issued for permissible services.

35.     As a result of defendants' conduct, on April 29, 2011, the SEC issued Litigation

Release No. 21951 announcing that defendant Glusic had consented to the entry of a judgment against him.  Pursuant to the judgment Mr. Glusic agreed to pay disgorgement of $1,878 with prejudgment interest of $231, and a $50,000 civil penalty. Furthermore, Mr. Glusic agreed to entry of an order imposing permanent officer and director and penny stock bars.

36.      Separately, the SEC issued an Order Instituting Administrative Proceedings and Notice of Hearing Pursuant to Section 12(j) of the Securities Exchange Act of 1934 against Magnum, to determine whether the registration of each class of its securities should be revoked or suspended for a period not exceeding twelve months based on its failure to file required periodic reports.

**The False and Misleading Statements**

37.      The Class period commenced on July 2, 2008, when the Company issued a press release, filed with the SEC on Form 8-K on July 8, 2008, announcing that it had signed and closed a five year, $40 million contract, with National Sales & Supply LLC ("NSS") for rubber nuggets.  This came shortly after the Company announced a deal with NSS for a five year, $90 million contract.

38.      On this news, Magnum's stock price gained $0.11 per share (from $0.25 to $0.36 per share) on heavy trade volume.  Specifically, Magnum's trading volume rose to 56,550 shares from 1,400 shares the previous day.

39.      These statements were false and misleading because the contracts were "no minimum" contracts that did not require the purchase of any specific amount of Magnum's products.  Indeed, in its annual statement, filed with the SEC on Form 10-K on February 12, 2009, the Company reported no revenue for the fiscal year ended September 30, 2008.  Hence no revenue had been generated as a result of the contract.

40.     Subsequently, on September 30, 2008, the Company issued a press release announcing it had completed a $1,000,000 non-dilutive type debt financing and was closing out its previously filed $1MM (Schedule D) subscription offer, dated April 30, 2008.  The Company further touted that it "holds open and unfilled contracts with NSS, LLC equating to over $130 Million USD over the next five years for the production of both rubber nuggets and rubber buffings."

41.     Subsequently, in a press release filed with the SEC on March 18, 2009, the Company claimed to have secured $15,000,000 in expansion funding.  Defendant Glusic stated "This marks the beginning of our planned expansion phase and will continue as we show further progress to our investors and the market. . .  The $15,000,000 funding will be used to immediately expand the Magog facility and increase capacity. Additional custom equipment will follow shortly to support the recent Magnum/SRI advancements in compound development so that Magog will soon be capable of manufacturing specialty compounds and sufficient batch production for delivery to manufacturers for production testing."

42.     This statement was false and misleading.  To date there has been no indication that the Company ever obtained this financing.

43.     Commencing on April 13, 2009, and throughout the month of April the Company began issuing press releases indicating that it was in negotiations to purchase a tire landfill.  In an April 13, 2009, press release entitled "Magnum Enters Negotiations to Acquire U.S. Tire Landfill Operator," Mr. Glusic said of the transaction as follows:

> We are pleased to inform our shareholders and investors that we have taken yet another major step forward in becoming a lead player in the recycling and rubber supply industry. It is somewhat premature to release the full details of our negotiations, **but let's just say we have resolved the most significant points of contention between the parties. We anticipate conclusion of**

> **our negotiations in short order followed by a Letter of Intent to consummate the deal based on these negotiated terms**. (Emphasis added).

As detailed above, Magnum made it appear the acquisition was imminent.

44.     On April 20, 2009, in a press release entitled "Magnum Updates Acquisition of U.S. Tire Landfill Operator and Prepares for New Rubber Recycling Equipment to Arrive at Magnum Magog Facility", Mr. Glusic provided an update on the transaction.  He said "Due to the numerous inquiries from shareholder, investors, and clients regarding size, cost, location, etc. of the facility Magnum recently announced it was in negotiations with, we are pleased to inform the public that things are progressing rapidly.  **We anticipate the release of a formal Letter-of-Intent shortly, followed expeditiously by several agreements that will lay out a schedule for due diligence, terms, and interim operations of the facility**." (Emphasis added).

45.     On April 28, 2011, the Company issued yet another press release touting its progress and providing an update on the $15,000,000 of expansion funding that were purportedly on the way.

46.     As are result of these misstatements, on April 29, 2009, Magnum's trading volume rose to more than 2 million shares.  This compares to average trading volume for Magnum shares of merely 31,424 shares from January through March 2009.  Similarly, Magnum's stock price also spiked.  On April 28, 2009, the Company's stock price closed at $1.54 per share.  By contrast, the average closing price of Magnum stock from January through March 2009 was a mere $0.43 per share.

47.     These statements were false and misleading because Magnum did not disclose that the tire company it sought to acquire the landfill operation from was going through Chapter 11 bankruptcy.  Even though the Company knew this fact during the time that it was issuing its press releases, Magnum did not reveal this information until August 19, 2009, when it filed its

quarterly statement on Form 10-Q with the SEC.

48.     On June 21, 2009, the Company issued other false and misleading press releases. Specifically, on that date the company issued two press releases – entitled "Magnum CEO Interviewed by WallStreetReporter.com, Company Plans on Releasing New TV Series and Filming" and "Magnum Films Exclusive Interview with Roger Ballentine, Ex-Chairman of the White House Climate Change Task Force to be Aired on CNBC, Fox Business News, and Hong Kong's Asia Television" – wherein Mr. Glusic was portrayed as being selected for interview by Mr. Ballentine.  The press releases also implied that Mr. Ballentine endorsed the Company.

49.     The truth is that Mr. Ballentine was an infomercial spokesman and discussed environmental and recycling issues generally as related to six different purported "green" companies including Magnum.  Moreover, he did not endorse Magnum.

50.     On this news, on June 22, 2009, Magnum's trading volume rose to more than 1.3 million shares and its stock price closed at $0.99 per share.  The prior day Magnum's shares closed at $0.82 per share.  Magnum's average trade volume from May through June 19, 2009, was only 202,846 shares per day.

51.     Magnum's false and misleading statements coincided with the Company's issuance of more than 12 million shares to purported consultants pursuant to its S-8 registration statements.  The Company's false Class Period statements enabled recipients of stock under this program to liquidate a significant number of their shares into the market at elevated prices.

52.     On January 13, 2010, Magnum filed its 2009 Form 10-K for the fiscal year ended September 30, 2009.  The Form 10-K included as an exhibit, the signed certification of Mr. Glusic which states as follows:

I, Joseph J. Glusic, certify that:

1. I have reviewed this Form 10-K of Magnum d'Or Resources Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report; and,

4. The small business issuer's certifying officer is responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

53.    The Form 10-K, and Mr. Glusic, certification were false and misleading because the Company failed to disclose that the Company had received a Formal Order of Investigation from the SEC's.

54.    On February 16, 2010, Magnum filed it quarter financial report, on Form 10-Q filed with the SEC, for the three months ended December 31, 2009.  The Form 10-Q contained a certification from Mr. Glusic similar to the one above.  The December 31, 2009, Form 10-Q was false and misleading because it failed to disclose the SEC's Formal Order of Investigation, dated October 30, 2009.

55.    Magnum's failure to disclose the SEC's Formal Order of Investigation, dated October 30, 2009 was false and misleading. Magnum's former outside independent certified public accountant, Mantyla McReynolds LLC advised Magnum that "the unaudited financial statements of the Company for the three month period ended December 31, 2009, cannot be relied upon because (among other things) additional disclosures related to the SEC's issuance of a Formal Order of Investigation dated October 30, 2009 should have been included within the Company's financial statements and within the footnotes as a material event and contingency. A copy of such order was not previously provided to Mantyla McReynolds LLC."

**The Truth Is Revealed**

56.    On April 13, 2010, the Company's outside auditor, Weinberg & Co., advised Glusic and Magnum that Weinberg & Co. was: (a) withdrawing its audit opinions for Magnum for the fiscal years ended 2009 and 2008, which were included in the Form 10-K filed with the SEC on January 13, 2010 and February 12, 2009; (b) confirming that it had already withdrawn its consents on April 8, 2010 relating to Forms S-1 dated April 6, 2010, March 18, 2010, and

February 5, 2010; and (c) withdrawing its prior consent relative to the Form S-8 dated June 29,

2009. (Form 8-K, dated April 13, 2010). Weinberg & Co. further explained that:

> [A]dditional disclosures related to the SEC's issuance of its Formal
> Order of Investigation, dated October 30, 2009, should have been
> included within [Weinberg & Co.'s] audit report dated January 5,
> 2010 and within the footnotes to the Company's 2009 financial
> statement as a material event and contingency. Such Order was not
> provided to [Weinberg & Co.] until April 7, 2010." (Form 8-K,
> dated April 13, 2010). Magnum's failure to timely disclose the
> SEC's formal investigation was false and misleading and led
> Weinberg & Co. to withdraw its audit report, dated January 5,
> 2010, which was included in Magnum's 2009 Form 10-K.
> Weinberg & Co.'s audit report had stated, among other things, that
> Magnum's financial statements included in the 2009 Form 10-K
> were "in conformity with accounting principles generally accepted
> in the United States of America.

57.     Magnum's stock priced dropped on this news, from a closing price of $0.45 on

April 13, 2010 to a closing price of $0.31 on April 14, 15 and 16 on heavy trading volumes:

1,383,136 shares on 4/14/10; 1,431,158 shares on 4/15/10; and 718,447 shares on 4/16/10.

58.     On April 19, 2010, the Company's outside auditor Mantyla McReynolds LLC

resigned as the independent certified public accountants of the Company from any further audit

services to the Company.

59.     Magnum filed no other quarterly or annual reports with the SEC for the remainder

of 2010 after the above-referenced Form 8-K filed on April 22, 2010. In 2011, Magnum also

failed to file any quarterly or annual reports, filing only three Forms 8-K, on April 15, May 9 and

May 20, 2011.

## SCIENTER ALLEGATIONS

60.     As alleged herein, defendants acted with scienter, in that they knew the

Company's public documents and statements issued or disseminated by or in the name of the

Company were materially false and misleading; they knew or recklessly disregarded that such

statements or documents would be issued or disseminated to the investing public; and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

61.     As alleged herein in detail, by virtue of their receipt of information reflecting the true facts regarding Magnum and its business practices, their control over or receipt of Magnum's materially false and misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning Magnum, defendants were active and culpable participants in the fraudulent scheme alleged herein.

62.     Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

63.     The ongoing fraudulent scheme described in this complaint could not have been so pervasive without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

64.     In particular, the Individual Defendants engaged in such a scheme to inflate the price of Magnum securities in order to facilitate a fraudulent kickback scheme that ultimately kept the Company afloat and rewarded them with huge salaries and bonuses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE FRAUD-ON-THE-MARKET DOCTRINE

65.     At all relevant times, the market for Magnum securities was efficient for the following reasons, among others:

(a)     Magnum's stock met the requirements for listing, and was listed and actively traded on the OTCBB, a highly efficient and automated market;

(b)     As a regulated issuer, Magnum filed periodic public reports with the SEC; and

(c)     Magnum regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

66.     As a result of the foregoing, the market for Magnum's securities promptly digested current information regarding Magnum from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of Magnum securities during the Class Period suffered similar injury through their purchase of Magnum securities at artificially inflated prices and a presumption of reliance applies.

**<u>NO SAFE HARBOR</u>**

67.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Magnum who knew that those statements were false when made.

## COUNT ONE

### Violation of Section 10(b) of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

68.     Plaintiff incorporates by reference paragraphs 1 though 67 above as if set forth herein.

69.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase Magnum securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

70.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Magnum securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Magnum as specified herein.

72.     These defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Magnum value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about Magnum and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Magnum securities during the Class Period.

73.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Magnum operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Magnum securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of Magnum publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Magnum securities during the Class Period at artificially high prices and were damaged thereby.

76.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the true financial position and operating conditions that Magnum was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise

acquired their Magnum securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

77.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

78.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT TWO**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

79.     Plaintiff incorporates by reference paragraphs 1 though 78 above as if set forth herein.

80.     The Individual Defendants acted as controlling persons of Magnum within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

81.     The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, Magnum and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

84.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.


Dated:  August 23, 2011                 **SAXENA WHITE P.A.**


                                        */s/Joseph E. White III*
                                        JOSEPH E. WHITE III
                                        2424 North Federal Highway
                                        Suite 257
                                        Boca Raton, FL 33431
                                        Tel. 561.394.3399
                                        Fax. 561.394.3382

                                        **WOLF HALDENSTEIN ADLER
                                          FREEMAN & HERZ LLP**
                                        Gregory M. Nespole
                                        Martin E. Restituyo
                                        270 Madison Avenue
                                        New York, NY  10016
                                        Telephone: (212) 545-4600
                                        Facsimile:   (212) 545-4653

                                        **LAW OFFICES OF BRUCE G. MURPHY**
                                        265 Llwyds Lane
                                        Vero Beach, Florida 32963
                                        Telephone:  (772) 231-4202

                                        *Attorneys for Plaintiff and the Class*